**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHOICE CARE HEALTH PLAN, INC. | ) | |
| 675 S Babcock Street | ) | |
| Melbourne, Florida 32901, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| THOMAS E. PRICE, M.D., | ) | |
| in his official capacity as | ) | |
| SECRETARY OF HEALTH | ) | |
| AND HUMAN SERVICES | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, D.C. 20201, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

Plaintiff Choice Care Health Plan, Inc. (CCHP) for its complaint against defendant

Thomas E. Price, M.D., Secretary of Health and Human Services (the Secretary), states and

alleges the following:

**INTRODUCTION**

1.       This is a lawsuit challenging a final administrative decision of the Secretary that

improperly reduced the amount of Medicare reimbursement owed to CCHP, a health care

prepayment plan, for 2004 and 2005.  The Secretary's decision is attached hereto as Exhibit A

and incorporated herein by reference.

2.       This challenge to the Secretary's decision is narrow in scope, focusing on one

category of costs addressed in the decision: compensation CCHP paid to Dr. Subhash Thareja for

his services as an invasive cardiologist.[1]  With regard to that category of costs, the Secretary's

decision violates the Medicare Act, regulations, and guidance governing reimbursement of health

care prepayment plans and is unsupported by substantial evidence.  It is therefore contrary to law,

not entitled to deference, and should be reversed.

3.      Specifically, the Secretary's decision (1) permitted the Centers for Medicare &

Medicaid Services (CMS) to disallow approximately 84% and 88% of Dr. Thareja's physician

compensation for 2004 and 2005, respectively, by treating Dr. Thareja as a part-time cardiologist,

despite the fact that he provided on average at least 60 hours per week of clinical services, and

(2) upheld CMS's use of unreliable physician salary survey data to determine allowable

compensation CCHP paid Dr. Thareja for his clinical services as an invasive cardiologist.  In

reaching these conclusions, the Secretary misapplied and misconstrued applicable Medicare

regulations and guidance and disregarded undisputed record evidence.

4.      These are not just factual disputes; they are errors of law and departures from

fundamental principles of Medicare reimbursement that have resulted in the Secretary

improperly disallowing substantial amounts of Medicare reimbursement to CCHP for 2004 and

2005.

5.      Accordingly, pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1395oo(f)(1), and the

Administrative Procedure Act, 5 U.S.C. § 706 (APA), CCHP brings this action for reversal of the

Secretary's final administrative decision with regard to the allowable physician compensation for

Dr. Thareja's services as an invasive cardiologist.

---

[1]      While CCHP disputes the Secretary's decision as to other costs claimed by CCHP, the
present action challenges only the portion of the Secretary's decision pertaining to Dr. Thareja's
cardiologist compensation.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1395oo(f)(1).

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 1395oo(f)(1).

## PARTIES

8.      At all times relevant to this action, CCHP provided services to Medicare and non-Medicare members, served the area of Brevard County in central Florida, and participated in the Medicare program as a health care prepayment plan.[2]  Medicare reimburses a health care prepayment plan, like CCHP, for the reasonable direct and indirect costs it incurs for covered Part B services (i.e., typically physician services) furnished to its Medicare enrollees.

9.      Defendant Dr. Thomas Price, the Secretary of Health and Human Services, is charged with implementing the provisions of the Medicare Act, Title XVIII of the Social Security Act (SSA), as amended, 42 U.S.C. § 1395 *et seq.*  The Secretary administers the Medicare program through CMS, an agency of the Department of Health and Human Services (HHS).  The Secretary is sued in his official capacity only.

## BACKGROUND

## I.      THE MEDICARE PROGRAM AND HEALTH CARE PREPAYMENT PLANS

10.      The Medicare program provides health insurance for individuals 65 years of age or older, some individuals with disabilities under age 65, and individuals with end-stage renal disease.  Medicare provides benefits by either paying health care providers directly for services

---

[2]      In 2009—motivated in large part by CMS's disallowance of costs incurred by the Plan for the 2004 and 2005 cost years that CCHP challenges in this action—CCHP terminated its participation in the Medicare program.

rendered to Medicare beneficiaries, or, in some cases, paying health care plans for the organization, financing and delivery of covered services to a defined population of Medicare beneficiaries.

11.     One type of Medicare health plan is a health care prepayment plan authorized under SSA § 1833(a), 42 U.S.C. § 1395l(a).  During all times relevant to this action, CCHP was such a health care prepayment plan that contracted with Medicare to provide services to beneficiaries eligible for Medicare Part B services and enrolled as members in CCHP's plan.

12.     Health care prepayment plans are reimbursed on a reasonable cost basis, meaning that Medicare reimburses such plans for the reasonable cost of covered services provided to enrolled Medicare beneficiaries.  *See* 42 U.S.C. § 1395l(a).

13.     The regulations governing Medicare payment to health care prepayment plans are found in 42 C.F.R. § 417 Subpart U (§§ 417.800 to 417.840).  The costs that are considered allowable for such plans generally are the same as those specified in 42 C.F.R. § 417 Subpart O (§§ 417.530 to 417.576) for cost-based health maintenance organizations and competitive medical plans.  *See* 42 C.F.R. §§ 417.800(c), 417.802(a).

14.     A health care prepayment plan may receive interim per capita payments from CMS.  *See* 42 C.F.R. § 417.808.  To facilitate final settlement or "true up" of payments, the plan submits an annual cost report to CMS that records, among other things, the total costs associated with providing services to Medicare and non-Medicare enrollees and the portion of those costs attributable to Medicare enrollees.  *See* 42 C.F.R. § 417.576(b).  CMS reviews the cost report and issues a Notice of Program Reimbursement (NPR) notifying the plan of the amount of reimbursement CMS has determined that the plan is entitled to receive for the costs attributable to Medicare enrollees for that year.  *See* 42 C.F.R. § 417.576(c)-(d).  CMS or the health care

prepayment plan, as appropriate, will then make payment on the difference between the total

reimbursement due and the total interim payments.  *See* 42 C.F.R. § 417.810(d).

15.     With regard to compensation a health care prepayment plan pays to physicians

who are employees and render services to the plan's members, 42 C.F.R. § 417.544(a) provides

that such compensation must be reasonable in relation to the services personally furnished and is

an allowable cost to the extent "it is commensurate with compensation paid for similar services

performed by similar physicians practicing in the same or a similar locality."  *See also* 42 C.F.R.

§ 417.802(a)-(b).

16.     Other regulations explain that owners of organizations that participate in the

Medicare program, including health care prepayment plans, "often furnish services as managers,

administrators, or in other capacities.  In such cases, it is equitable that reasonable compensation

for the services furnished to be an allowable cost."  42 C.F.R. § 413.102(c)(1) (incorporated by

reference into the regulations governing health care prepayment plans by 42 C.F.R.

§ 417.536(e)).  The "[r]easonableness" of owner compensation for such management and

administrative services "may be determined by reference to, or in comparison with,

compensation paid for comparable services and responsibilities in comparable institutions; or it

may be determined by other appropriate means."  42 C.F.R. § 413.102(c)(2).

## II.     CCHP's 2004-2005 COST REPORTS

17.     During all times relevant to this action, Dr. Subhash Thareja was the owner of

CCHP.  Following the untimely death of its Chief Executive Officer (CEO) in 2003, Dr. Thareja

began serving as the CEO of CCHP and Quality Medical Care (QMC), which employed

physicians and staff used by CCHP.  During this period, Dr. Thareja worked full-time as a

cardiologist employed by CCHP.  He maintained a very busy practice, providing cardiology

services more than 60 hours per week, on average.  Dr. Thareja is a highly skilled and well

respected invasive cardiologist.  By 2004, he had over 14 years of experience in his profession.

18.     As required by the Medicare program, CCHP submitted its cost reports to CMS

for cost years 2004 and 2005.

19.     Among other costs, CCHP's cost reports included compensation paid to Dr.

Thareja for the clinical services he rendered as an invasive cardiologist to CCHP's members and

for his services as CEO.  Relevant to the present challenge, CCHP paid Dr. Thareja

approximately $1.5 million and $2 million in 2004 and 2005, respectively, for his services as an

invasive cardiologist.  Some portion of Dr. Thareja's physician compensation was for treating

Medicare patients enrolled in CCHP, and the rest was for treating non-Medicare patients.[3]

## III.     A SUBSTANTIAL PORTION OF DR. THAREJA'S PHYSICIAN COMPENSATION ON CCHP's 2004 AND 2005 COST REPORTS WAS DISALLOWED.

20.     In 2008, CMS's auditor, Bland & Associates, P.C. (Bland), for the first time

called into question the compensation paid to Dr. Thareja more than four years prior.[4]  Among

other things, Bland concluded that Dr. Thareja should have been paid only about 16% and 12%

of what CCHP actually paid for his services as an invasive cardiologist for 2004 and 2005,

respectively.  Specifically, Brand recommended allowing $239,992 and $249,831 in 2004 and

2005, respectively, for Dr. Thareja's full-time services as a physician and disallowed over $1.2

million of physician compensation for 2004 and $1.8 million in physician compensation for 2005.

---

[3]     Although the Medicare regulations require evaluation of the reasonableness of Dr. Thareja's total compensation, Medicare ultimately will be responsible for reimbursing the portion of Dr. Thareja's compensation that is attributable to services furnished only to Medicare patients.

[4]     CCHP had been audited by CMS for earlier cost years, and CMS did not make any adjustments based on Dr. Thareja's compensation at that time.

21.     Bland's recommended disallowance of Dr. Thareja's compensation for clinical services was inconsistent with the Medicare regulations governing compensation of physicians by health care prepayment plans.  Under those regulations, the compensation must be reasonable, which is determined in relation to the clinical services personally performed by the physician and the compensation paid to similar physicians providing those same types of services in the same locality.  By incorrectly treating Dr. Thareja as a part-time cardiologist, notwithstanding the undisputed evidence that he provided cardiology services an average of at least 60 hours per work, Bland's recommendation conflicted with the governing Medicare rules.  Bland's recommendation also was faulty because Bland used unreliable data and selected the wrong methodology to determine comparable physician compensation.

22.     Bland acknowledged that Dr. Thareja was extremely productive and indicated that the 100th percentile of compensation survey data would be the appropriate standard for reasonable compensation.  Bland calculated what it believed to be the 100th percentile of salary data for cardiologists in the southern region of the United States based on survey data from the employment website Monster.com (which is drawn from Salary.com).  Notwithstanding Dr. Thareja's full-time work as an invasive cardiologist, Bland then treated Dr. Thareja as a part-time cardiologist and part-time CEO, splitting his time 55% and 45%, respectively.  Specifically, Bland calculated 55% of what it believed to be the 100th percentile of the Salary.com survey data to determine the "reasonable" compensation for Dr. Thareja as an invasive cardiologist.  As a result, Bland recommended disallowing a substantial amount of the compensation CCHP paid Dr. Thareja for his clinical services, reducing Dr. Thareja's compensation for his full-time clinical work by about 84% for 2004—from $1,520,063 to only $239,992—and about 88% for 2005— from $2,093,208 to only $249,831.

23.     In an NPR issued on February 11, 2009, CMS adopted, without modification, Bland's proposed disallowances to, among other things, the costs claimed on CCHP's cost reports for compensating Dr. Thareja for his invasive cardiology services in 2004 and 2005.

24.     CCHP timely appealed to a CMS Hearing Officer.  A hearing was conducted on June 6, 2013, at which CCHP presented extensive evidence showing that the compensation paid to Dr. Thareja was reasonable and consistent with the Medicare regulations.  CCHP also demonstrated that CMS relied on flawed and unreliable survey data and an erroneous methodology to incorrectly conclude that the amount of Dr. Thareja's physician compensation was not reasonable.

25.     First, CCHP demonstrated that Dr. Thareja performed all of the duties of a full-time invasive cardiologist, providing an average of more than 60 hours per week of invasive cardiology services to patients in 2004 and 2005.  CCHP presented evidence that this weekly average was a conservative estimate of Dr. Thareja's clinical time, and even so, exceeded the vast majority of his invasive cardiologist peers.  A survey conducted by the Medical Group Management Association (MGMA) shows that the mean—or average—invasive cardiologist worked only 46.44 hours per week.  CMS did not present any evidence to refute the extraordinary level of effort that Dr. Thareja devoted to his clinical work, which even CMS's auditor had acknowledged during its audit.

26.     Second, CCHP established that the data Bland used to determine the range of compensation for invasive cardiologists, which were drawn from Salary.com, were incorrect and unreliable, and that by contrast, the MGMA survey data are considered the "gold standard" among health care provider salary surveys.

27.      Third, CCHP presented Dr. Mary Gray, a statistician, who testified that in her opinion, the MGMA surveys were superior to the Salary.com survey.  She also explained that CMS had adopted a calculation of the 100th percentile of the survey data that was mathematically flawed, as it appeared from the calculation that CMS's auditor had confused the concepts of percentiles and percentages.  Dr. Gray testified that it is impossible to calculate the 100th percentile; instead is possible to calculated the 99.8th percentile as only the closest approximation of the 100th percentile.

28.      Dr. Gray explained that if she calculated the 99.8th percentile using the correct mathematical approach and applied it to the more reliable compensation data from the MGMA surveys, the resulting dollar amounts (which were over a million dollars per year for both 2004 and 2005) would be the *least possible estimate* for the 99.8th percentile.  Dr. Gray explained that estimating percentile values of the salary survey data required the assumption that salary data follow the pattern known as a normal distribution (or bell-shaped curve), in which the data points are spread symmetrically on both sides of the mean, or average salary.  Dr. Gray further explained that, in the real world, salary data do not follow a normal distribution pattern because the lowest possible value for a person's salary is $0 and there are also some very highly-paid people, such as Bill Gates, whose salary is far above the average.  That means that salary data are skewed towards the high-end of the distribution.  As a result, the actual dollar amount that corresponds to the 99.8th percentile of compensation for comparable invasive cardiologists could be much higher than Dr. Gray's estimates (which, as explained below, were the dollar amounts selected by the Hearing Officer).  In any event, the 99.8th percentile of the more reliable compensation data from the MGMA surveys for 2004 and 2005 showed that Bland's use of the

Salary.com data grossly underestimated the range of compensation for cardiologists in the southern region of the United States.

29.     On November 14, 2014, the Hearing Officer issued a decision.  The Hearing Officer concluded, based on the preponderance of the evidence, that Dr. Thareja was a highly productive invasive cardiologist comparable to similar physicians compensated at the highest end of the range reported in the MGMA survey.  Specifically, the Hearing Officer found that it was appropriate to use the MGMA surveys, rather than the Salary.com survey, to determine the range of compensation for invasive cardiologists comparable to Dr. Thareja.  The Hearing Officer likewise agreed that CMS's auditor's methodology for calculating the "reasonable" compensation—calculation of the 100th percentile—for Dr. Thareja was fundamentally flawed and concluded that the calculation performed by Dr. Gray to determine the 99.8th percentile was the appropriate formula to calculate the highest percentile in the compensation range for invasive cardiologists surveyed in the southern region of the United States.  Yet even though Dr. Gray explained why the actual dollar amounts that correspond to the highest end of the compensation range would likely be higher than the amounts that she calculated as the 99.8th percentile for 2004 and 2005, and CMS did not present any evidence to refute those facts, the Hearing Officer concluded that the reasonable compensation for Dr. Thareja's invasive cardiology services should be limited to those lower estimated amounts.

30.     Both CMS and CCHP subsequently requested review of the Hearing Officer's decision by the Administrator of CMS pursuant to 42 C.F.R. § 405.1834.

31.     In a decision dated December 21, 2016, Dr. Patrick Conway, the Acting Principal Deputy Administrator for CMS reversed the Hearing Officer's decision.  The Administrator's decision upheld CMS's adoption of Bland's methodology and affirmed CMS's request for

repayment of a substantial portion of the costs that are at issue here: compensation paid to Dr.

Thareja for his services as invasive cardiologist.  The Administrator's decision is the final

decision of the Secretary.  *See* Exhibit A at 18.

32.     CCHP timely filed this action within sixty days of receipt of the Secretary's

decision.  *See* 42 C.F.R. §§ 405.1801(1)(iii), 405.1877(a)(2).

## IV.     THE SECRETARY WRONGLY UPHELD CMS's DISALLOWANCE OF COMPENSATION CCHP PAID DR. THAREJA FOR HIS SERVICES AS AN INVASIVE CARDIOLOGIST.

33.     The compensation CCHP paid Dr. Thareja for his services as an invasive

cardiologist was reasonable under the governing legal standard.  The Secretary's decision thus

was incorrect and contrary to law.

34.     In upholding CMS's disallowance of a substantial portion of the compensation

costs for Dr. Thareja's physician services on CCHP's 2004 and 2005 cost reports, the Secretary

concluded that the Hearing Officer was wrong in finding that CCHP was entitled to

reimbursement for compensation costs for Dr. Thareja's full-time work as a physician.  Instead,

the Secretary upheld Bland's methodology, adopted by CMS, which determined Dr. Thareja's

allowable physician compensation by calculating 55% of what Bland considered to be

comparable compensation for a full-time invasive cardiologist in the Melbourne, Florida area

(using the Salary.com data).  The Secretary concluded that this methodology, and the resulting

disallowance of substantial portion of compensation for Dr. Thareja's clinical services, was

appropriate because physician-owner compensation is subject to allocation between the

professional component (physician compensation) and provider component (CEO administrative

compensation).

35.     The Secretary also decided that the Hearing Officer was wrong in concluding that CCHP is entitled to be reimbursed for the cost of Dr. Thareja's clinical compensation equal to the 99.8[th] percentile (as calculated by Dr. Gray) using the 2004 and 2005 MGMA surveys for invasive cardiologists in the southern region of the United States.[5]   Conversely, the Secretary found that Bland's use of the Salary.com data, which CMS adopted wholesale, was appropriate to establish reasonable compensation for cardiologists in the Melbourne, Florida area.

36.     The Secretary's decision is incorrect and contrary to law and the record evidence for at least two primary reasons.

**A.      The Secretary's decision incorrectly treats Dr. Thareja as a part-time cardiologist.**

37.     The principles the Secretary relied on to treat Dr. Thareja as a part-time invasive cardiologist simply do not apply to determining the reasonableness of costs for compensation a health care prepayment plan, like CCHP, pays to physicians for their clinical services.

38.     The Secretary misapplied Medicare regulations and guidance applicable to owner compensation for *operational services*.  Those regulations provide that reasonable owner compensation is determined based on, among other things (1) comparable salary paid to non-owners for providing similar administrative and management services in a similar institution, (2) allocation of operational compensation between institutions when an owner provides operational services to multiple institutions, and distinguishing such operational services (which are allowable) from services an owner performs to manage his ownership investment in the institution (which are not allowable).  Relying on these principles for owner compensation for

---

[5]     The 99.8[th] percentile amount that the Hearing Officer found to be reasonable compensation for Dr. Thareja's clinical services is less than the amount that CCHP paid for Dr. Thareja for his clinical work and that CCHP showed was reasonable under the applicable legal standard.  *See, e.g.*, paragraph 29 *supra.*

operational services, the Secretary incorrectly concluded that "providing for two full-time salaries"—one for Dr. Thareja's clinical work and the other for his CEO work—"is not by definition an allocation." Exhibit A at 14.  Based on this erroneous conclusion, the Secretary decided that CMS was justified in calculating the total allowable costs for Dr. Thareja's total compensation for his physician and CEO work by reducing the comparable salary for a full-time invasive cardiologist and the comparable salary for a full-time CEOs based on a purported 55/45 split of Dr. Thareja's time spent on his cardiology practice and his administrative duties.  The Secretary reached his conclusions notwithstanding the fact that CCHP provided evidence and witness testimony showing Dr. Thareja to be a well-regarded and highly busy invasive cardiologist, while CMS presented no evidence or testimony that Dr. Thareja did not perform the extraordinary level of physician services that generated his physician compensation.  And, contrary to the Secretary's findings, nothing in the Medicare regulations and guidance applicable to health care prepayment plans prohibits reimbursement for reasonable compensation paid to a physician-owner, like Dr. Thareja, for full-time work as a clinical cardiologist and for additional work as a CEO.

39.     Specifically, the Secretary incorrectly applied "the reasonable cost rules specific to reimbursement of owner's compensation under 42 C.F.R. § 413.102" and Chapter 9 of the Medicare Provider Reimbursement Manual (PRM) to  evaluate the amount Dr. Thareja was paid for his clinical work and the amount paid for his administrative services.  Exhibit A at 6.  That Medicare regulation and chapter of the PRM pertain to compensation for an owner's services "pertinent to the operation and sound conduct of the institution" and for which "the institution would have had to employ another person to perform" "had the owner not furnished the services."  42 C.F.R. § 413.102(b)(2)(3); *see also* PRM, CMS Pub. 15-1, Ch. 9, §§ 900, 901,

902.3, 902.4 (listing 42 C.F.R. § 413.102 as the regulatory authority for reasonable cost principles for owner compensation for services "in connection with the operation" of the institution).

40.     The PRM provisions cited by the Secretary as setting out "factors to be applied in evaluating compensation within the range for comparable institutions," *see* Exhibit A at 8, make clear that those factors apply to an owner's operational services, not clinical services, that an owner may perform. For example, the PRM states: "Where an owner-administrator is also a physician, the services evaluated are administrative in nature rather than the actual practice of medicine. Therefore, the compensation allowed is based on the compensation nonphysician administrators receive rather than on the rate physicians receive for their professional services." *Id.* (quoting PRM, § 904.2(A)).

41.     Consistent with these principles, the reasonableness of the owner's compensation operational services ordinarily is determined based on "compensation paid for comparable services and responsibilities in comparable institutions." 42 C.F.R. § 413.102(c)(2); PRM § 902.3. In contrast, the relevant regulation governing compensation for physician clinical work, 42 C.F.R. § 417.544, contains no reference to "comparable institutions" and explicitly sets out a different test when determining appropriate reimbursement.

42.     The Secretary relies on selective language in 42 C.F.R. § 504.102 and the PRM as support for his conclusion that "CMS correctly apportioned Dr. Thareja's salaries between his various roles" because the PRM provides that "a factor to be considered" in determining a physician-owner's compensation "is whether the owner performs services for any other institutions or is engaged in any other occupations." Exhibit A at 14, 15. The Secretory ignores that 42 C.F.R. § 413.102 and the sections of the PRM he cites pertain to owner compensation for

*operational* services.  Thus, statements in the PRM that "an owner [who] performs services for several institutions" "presumably" "spends less than full time (i.e., at least less 40 hours a week) within each institution" and "an owner-administrator [ ] ordinarily could not render full-time services as administrator of the institution" have no bearing on determining reasonable compensation for a physician-owner's clinical services.  *See* PRM § 904.2

43.    The Secretary also takes out of context and misconstrues a handful of sentences that refer to "patient care" and "professional services" as applying to a physician-owner's compensation for clinical work.  For example, two of the sentences the Secretary highlights merely draw a distinction between "[c]osts of activities not related to either direct or indirect patient care, i.e., those primarily for the purpose of managing or improving the owner's financial investment," which "are not recognized as an allowable cost," and operational services an owner furnishes in connection with patient care, such "as administration, management, and supervision of the overall institution," which are allowable.  Exhibit A at 7 (quoting PRM § 902.2) (emphasis removed).

44.    Even if the PRM provisions cited by the Secretary applied to physician-owner compensation for clinical work, which they do not, they do not justify the Secretary's decision to treat Dr. Thareja as a part-time cardiologist under the circumstances here, where he worked an average of at least 60 hours a week performing clinical services.

45.    The compensation that CCHP paid to Dr. Thareja for the invasive cardiology services he furnished in 2004 and 2005 was perfectly consistent with the requirements of the Medicare regulations and guidance.  The relevant regulations provide that compensation paid to physicians must be reasonable in relation to the services personally furnished and is an allowable cost to the extent it is commensurate with compensation paid "for similar services performed by

similar physicians practicing in the same or a similar locality." 42 C.F.R. § 417.544(a)(1)-(2).[6] Consistent with the regulations, the Medicare Managed Care Manual directs that amounts paid by a health care prepayment plan to physicians who are employees will be found reasonable to the extent they are commensurate with amounts paid for similar services performed by similar physicians in the same or similar locality. Medicare Managed Care Manual, Ch. 18, Subch. B, § 20.

46. CCHP established that Dr. Thareja's compensation was reasonable in relation to the services that he personally furnished, as he worked more hours than the vast majority of invasive cardiologists and provided high quality care. As set out above, even the conservative estimates of the amount of time that Dr. Thareja spent furnishing clinical services show that Dr. Thareja worked full-time as an invasive cardiologist and the amount of time that Dr. Thareja spent furnishing clinical services show that Dr. Thareja was truly exceptional compared to his peers. CCHP also demonstrated through numerous methods, including comparison to the 99.8[th] percentile of MGMA data, that Dr. Thareja's compensation was commensurate with that of comparable, highly productive, invasive cardiologists in central Florida.

47. Accordingly, the Secretary's decision affirming CMS's reduction of Dr. Thareja's clinical compensation below the full-time level at which he actually provided clinical

---

[6] Under the regulation at 42 C.F.R § 417.802(a), "[t]he costs that are considered allowable for HCPP [health care prepayment plan] reimbursement are the same as those for reasonable cost HMOs [health maintenance organizations] and CMPs [competitive medical plans] specified in subpart O of this part[.]" Therefore, the regulation governing the allowable cost of physician services furnished directly by HMOs and CMPs, 42 C.F.R. § 417.544(a)(1), applies to CCHP. The same standard also applies to the costs of physician services furnished under arrangements, which are considered reasonable if they "[d]o not exceed those that a prudent and cost-conscious buyer would incur to purchase those services" and "[a]re comparable to costs incurred for similar services furnished by similar physicians and other suppliers in the same or a similar locality." *Id.* § 417.802(b)(2).

services—and allowing only about 16% and 12% of the amount CCPH actually compensated

Dr. Thareja for his full-time clinical work for 2004 and 2005, respectively—is contrary to the

Medicare regulations and CMS guidance that the cost of compensation paid to a physician is an

allowable cost to the extent it is commensurate with compensation paid to similar physicians

performing similar services in as similar geographic location and must be reasonable in relation

to the services personally furnished by the physician.

       **B.**     **The Secretary's decision incorrectly affirms CMS's use of Salary.com data.**

       48.     Contrary to what the Secretary found, the Salary.com data used by Bland, and

adopted by CMS, are not a valid basis to determine reasonable compensation for invasive

cardiologists in the area served by CCHP.   The record reflects that the Salary.com data are

flawed and unreliable.  Among other things, the Salary.com survey did not identify the sample

size used to create its distribution of salaries for invasive cardiologists, and when asked for the

size of that sample set, Salary.com refused to disclose that information.  Thus, the Secretary had

no basis to find that "[t]he survey used in this case included a sufficient number of salaries to

ensure that the data was statistically valid." *See* Exhibit A at 14.[7]  Because the Salary.com data

are flawed and unreliable, they do not accurately reflect compensation for similar services

performed by similar physicians practicing in the same locality.  Accordingly, the Secretary's

decision affirming its use as a basis to disallow compensation costs for Dr. Thareja's cardiology

services violates the Medicare regulations applicable to physician compensation.

       49.     In sum, the Secretary's findings that (1) "CMS [ ] properly allocated the

appropriately determined reasonable compensation amounts for [Dr. Thareja's] physician

---

[7]     In contrast, the record reflects that the MGMA survey indicated its data are based on a sample size of 174 invasive cardiologists in the Southern Region, a number that Dr. Gray testified was sufficient to derive reliable results.

compensation and the CEO compensation between the professional component and provider component," and (2) CMS's "use of salary data from . . . . Salary.com data was appropriate to establish reasonable [physician] compensation" for Dr. Thareja's services as an invasive cardiologist in "the area served by CCHP," are incorrect, arbitrary, capricious, and contrary to law. Exhibit A at 13, 16. Likewise, the Secretary's decision to treat Dr. Thareja as a part-time cardiologist is unsupported by substantial evidence.

## COUNT I

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 706)

50.     The allegations of numbered paragraphs 1 through 50 are re-alleged and incorporated herein by reference.

51.     Under the APA, a final decision of the Secretary is unlawful and must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A). The Secretary's final decision also must be set aside as unlawful if it is "unsupported by substantial evidence." *Id.* at § 706(2)(E).

52.     The Secretary's decision affirming CMS's disallowance of a substantial portion of physician compensation costs CCHP incurred and claimed on its cost reports for Dr. Thareja's services as an invasive cardiologist is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. In particular, the Secretary's decision is contrary to SSA § 1833(a)(1)(A), 42 U.S.C. § 1395l(a)(1)(A), Medicare regulations at 42 C.F.R. §§ 417.544(a) and 417.802(b), and CMS guidance because it purports to calculate reimbursement owed to CCHP for Dr. Thareja's physician services using Medicare reimbursement principles for owner compensation rather than physician compensation. The Secretary's decision also violates these statutory and regulatory provisions and guidance because it affirms use of unreliable salary

survey data and results in reimbursement that is neither reasonable in relation to the clinical services Dr. Thareja personally furnished nor commensurate with compensation paid for similar services performed by similar physicians practicing in the same or similar locality.

53.     The Secretary's decision to disallow a substantial portion of Dr. Thareja's physician compensation by treating Dr. Thareja as a part-time cardiologist also is unsupported by substantial evidence.  CMS failed to provide a witness or other evidence on this issue and the record clearly reflects that Dr. Thareja provided at least 60 hours per week of clinical services.

54.     For these reasons, the Secretary's decision violates the APA and must be set aside.

### PRAYER FOR RELIEF

**WHEREFORE**, CCHP respectfully prays:

A.     That this Court reverse the final decision of the Secretary as to the amount of costs for which CCHP should be reimbursed for compensation paid for Dr. Thareja's services as an invasive cardiologist for cost years 2004 and 2005;

B.     That this Court determine that CCHP's claimed physician compensation costs in cost years 2004 and 2005 for Dr. Thareja's services as an invasive cardiologist are reasonable and thus allowable costs under applicable Medicare statutory and regulatory provisions, including 42 C.F.R. § 417.544;

C.     That this Court remand this matter to the Secretary with instructions to take action consistent with the Court's decision;

D.     That this Court award CCHP its costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 2412;

E.     That this Court grant such other relief as may be just, equitable, and appropriate.

Respectfully submitted,

HOGAN LOVELLS US LLP

By____/s/ Briana L. Black_____
Briana L. Black, D.C. Bar No. 989775
Sheree R. Kanner, D.C. Bar No. 366926
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone:(202) 637-5600
Facsimile: (202) 637-5910

*Counsel for Plaintiff Choice Care Health Plan, Inc.*

Dated:  February 21, 2017