# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CHOICE CARE HEALTH PLAN, INC.**,<br><br>Plaintiff,<br><br>v.<br><br>**ALEX M. AZAR II**, *in his official capacity as Secretary of Health and Human Services*,<br><br>Defendant. | Case No. 1:17-cv-00311 (TNM) |

## MEMORANDUM OPINION

Choice Care Health Plan, Inc. sued the Secretary of the Department of Health and Human Services[1] because the Administrator of an agency within the Department found that Choice Care Health Plan claimed several million dollars of Medicare reimbursements to which it was not entitled. Choice Care Health Plan argues that the decision violates the Administrative Procedure Act because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The parties' Cross-Motions for Summary Judgment are now before me. Because substantial evidence supports the Administrator's determination, Choice Care Health Plan's Motion for Summary Judgment will be denied and the Defendant's Cross-Motion for Summary Judgment will be granted.

---

[1] The Complaint named then-Secretary Thomas E. Price as the Defendant in his official capacity. Federal Rule of Civil Procedure 25(d) automatically substitutes his successor, Alex M. Azar II, as the Defendant.

# I. BACKGROUND

Although he is not a named party, Dr. Subhash Thareja is a ubiquitous and central figure in the case. In 2004 and 2005, Dr. Thareja was the owner and CEO of Choice Care Health Plan, or CCHP. Compl. ¶ 17. He was also the owner and CEO of Quality Medical Care, or QMC. *Id.*; *id.* Ex. A at 10. And he worked for QMC as a cardiologist. Pl.'s Mot. Summary J. 5. Dr. Thareja provided clinical services to QMC patients who were members of the CCHP health care prepayment plan. Compl. ¶ 19.

From 2004 to 2005, CCHP paid Dr. Thareja a salary of over $5.5 million, including bonuses, for his services as a cardiologist and CEO. *Id.* Ex. A at 10. CCHP included this pay in cost reports that it submitted to Medicare for reimbursement. *Id.* For 2004, CCHP claimed $2,420,063 in Medicare reimbursements for Dr. Thareja's salary—$300,00 for his work as CEO of CCHP, $300,000 for his work as CEO of QMC, $300,000 as a bonus for his work as CEO, and just over $1.5 million for his cardiology services. *Id.* Ex. A at 10. For 2005, CCHP claimed $3,128,208 in Medicare reimbursements—$435,00 for his work as CEO of CCHP, $300,000 for his work as CEO of QMC, $300,000 as a bonus for his work as CEO, and nearly $2.1 million for his cardiology services. *Id.* Initially, CCHP also sought Medicare reimbursement for other benefits that it provided Dr. Thareja, such as a car, life insurance, travel, entertainment, donations, gifts, meals, and exercise equipment. *Id.* at 10, 11 n.4; AR 865; *see also* Pl.'s Mot. Summary J. 22.

In 2008, an auditor for the Centers for Medicare & Medicaid Services, or CMS, questioned these reimbursement claims. Compl. ¶ 20. The auditor determined that Dr. Thareja's total compensation from CCHP in 2004 and 2005 should have been less than $1 million. *Id.* It found that it was unreasonable to pay Dr. Thareja multiple full-time salaries based on CCHP's

2

assertion that he worked about 127 hours a week for two years when CCHP had no auditable, contemporaneous documentation of Dr. Thareja's hours. AR 80. Instead, it credited testimony offered by CCHP that Dr. Thareja spent about 55% of his work time performing cardiology services and 45% of his work time working as a CEO. *See* AR 81. Thus, the auditor recommended that Medicare reimburse Dr. Thareja 55% of the salary of a top-paid, full-time cardiologist and 45% of the salary of a top-paid, full-time CEO. *Id.* CMS adopted the auditor's recommendation without modification and directed CCHP to return nearly $5.75 million of the Medicare reimbursements that it had received for payments to Dr. Thareja in 2004 and 2005. *Id.* ¶ 23; AR 79. CCHP filed an administrative appeal, and a CMS hearing officer determined that CCHP could keep nearly $2.5 million—more than the roughly $1 million CMS had recommended. AR 92.

Both sides requested that the CMS Administrator review the hearing officer's determination. Compl. ¶ 30. The Administrator reversed the hearing officer's determination and reinstated CMS's initial determination that CCHP owed Medicare nearly $5.75 million. *Id.* ¶ 31. The Administrator determined that CMS had "correctly apportioned Dr. Thareja's salaries between his various roles, using [CCHP's] own estimate of his time spent on his cardiology practice and on his administrative duties." *Id.* Ex. A at 15.

CCHP then took its claims to federal court, arguing that the Administrator's decision violated the Administrative Procedure Act, or APA, by disallowing reimbursement of over $3.1 million paid to Dr. Thareja for his services as a cardiologist. *See* Compl. ¶ 22-23, 31, 52-54. CCHP has chosen not to contest the disallowance of other claimed reimbursements. Reply ISO Pl.'s Mot. Summary J. 1. The parties filed Cross-Motions for Summary Judgment.

## II. LEGAL STANDARD

The APA authorizes courts to review agency decisions. 5 U.S.C. § 702. A court's review is limited to the administrative record, and the court must determine if that record supports the agency's decision. *Coe v. McHugh*, 968 F. Supp. 2d 237, 239 (D.D.C. 2013). The court will grant summary judgment to the agency if the agency action is "supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* at 240. On the other hand, if the agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the court will grant summary judgment to the plaintiff. *See* 5 U.S.C. § 706. In resolving this question, the court asks whether "the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014), *aff'd sub nom. Fulbright v. Murphy*, 650 F. App'x 3 (D.C. Cir. 2016).

## III. ANALYSIS

The touchstone for Medicare reimbursements to health care prepayment plans like CCHP is "reasonable cost." 42 C.F.R. § 417.800(c). Medicare reimbursement for a physician's clinical work should be "commensurate with the compensation paid for similar services performed by similar physicians practicing in the same or a similar locality." 42 C.F.R. § 417.544(a)(1). A provider claiming Medicare reimbursement "must provide adequate cost data," meaning that the provider must provide accurate documentation with enough detail to support its reimbursement claim. 42 C.F.R. 413.24(a), (c). "Adequate data capable of being audited is consistent with good business concepts [and] is a reasonable expectation on the part of any agency paying for services on a cost-reimbursement basis." 42 C.F.R. 413.24(c).

### A. The Administrator's Treatment of Dr. Thareja as a Part-Time Cardiologist Does Not Violate the Administrative Procedure Act

The Administrator affirmed CMS's determination that a reasonable cost for Dr. Thareja's cardiology services would be 55% of the pay that a full-time cardiologist in his area would have received. Compl. Ex. A 12-13, 17. CMS based this determination on a statement to the CMS auditor by Janet Cody, QMC's CFO, that she thought Dr. Thareja spent about 55% of his time practicing cardiology and 45% of his time performing managerial and administrative tasks. *Id.* at 12. Recall that Dr. Thareja was employed as QMC's CEO, presumably as Ms. Cody's boss. *See* Compl. ¶ 17. The Administrator affirmed CMS's approximation because CCHP did not produce adequate documentation to support a claim for a full-time cardiologist's salary. *Id.* at 16.

CCHP challenges the Administrator's treatment of Dr. Thareja as a part-time physician on two grounds. *First*, CCHP argues that the record does not support treating Dr. Thareja as a part-time physician because it shows that Dr. Thareja spent more time each week working as a physician than the average cardiologist. Pl.'s Mot. Summary J. 18-25. But the record does not so demonstrate. In fact, it does not contain any auditable contemporaneous documentation of Dr. Thareja's hours. Pl.'s Compl. Ex. A 16. The best CCHP can point to is its extrapolations from the procedures for which Dr. Thareja billed and his after-the-fact estimates of how long each procedure would have likely taken. *See* AR 160-63, 213-15, 412-21. According to these extrapolations, Dr. Thareja provided cardiology services for at least 68.8 hours per week in 2004 and 61.2 hours per week in 2005. AR 214, 421.[2]

---

[2] Even if Dr. Thareja worked these hours, CCHP has not given a convincing justification for claiming $1.5 million in 2004, when Dr. Thareja allegedly worked 68.8 hours a week, and $2.1 million in 2005, when Dr. Thareja allegedly worked 61.2 hours a week. CCHP claims almost 55% more for each hour it alleges that Dr. Thareja worked as a cardiologist in 2005 than in 2004, which undermines any suggestion that its reimbursement claims have a rational connection to the amount of work Dr. Thareja performed.

But these extrapolations are not "adequate cost data" under 42 C.F.R. 413.24(a). They are not auditable since they are based on Dr. Thareja's own after-the-fact estimates of the time taken for each procedure, and they fail to distinguish between procedures done for patients enrolled in Medicare and procedures done for other patients. *See* AR 161, 163, 413; *cf. Dyna Care Home Health, Inc. v. Shalala*, 1999 WL 498606 at *9-10 (N.D. Ill. July 7, 1999) (affirming disallowance of claim for travel costs based on after-the-fact estimates of vehicle mileage that were not auditable and did not distinguish between reimbursable business travel and travel for personal purposes). And these extrapolations are at least in tension with CCHP's original claim that Dr. Thareja worked 70 hours a week as a cardiologist. *See* Compl. Ex. A 15.[3] The idea that Dr. Thareja worked these hours as a cardiologist while also working "an inordinate amount of time" as a CEO is hardly credible. *See* AR 713; *see also* AR 412 (Ms. Cody thought Dr. Thareja spent only slightly less time working as a CEO than as a cardiologist). Given the evidence that Dr. Thareja spent significant time working as a CEO and the inadequacy of the evidence that he worked full time as a cardiologist, the Administrator correctly determined that a full-time salary for Dr. Thareja's cardiology services was unreasonable. *See id.* at 15-16.

*Second*, CCHP argues that the Administrator's decision erroneously relies on 42 U.S.C. § 413.102 and on Chapter 9 of the Provider Reimbursement Manuel, or PRM, to establish the principle that a physician-owner should allocate his reimbursement claims between work as a physician and work as an owner. Pl.'s Mot. Summary J. 13-18. But it does not matter whether

---

[3] If that were 55% of his work as Ms. Cody estimated, he would have worked another 57 hours each week as a CEO, for a total 127 hours per week, or over 18 hours every day of 50 weeks each year. CCHP has distanced itself from this position, saying that Ms. Cody's statement to the auditor was an estimate and that it never directly claimed Dr. Thareja worked that much. Pl.'s Mot. Summary J. 7-8. But it is only marginally more credible to claim that Dr. Thareja worked 68.8 hours per week as a cardiologist while also working "an inordinate amount of time" as a CEO. *See* Def.'s Cross-Mot. Summary J. 20; *see also* AR 713.

6

these regulations apply to physician compensation. Although the Administrator's opinion does reference these regulations, they provide only one of the grounds for his decision. *See* Compl. Ex. A 14-15. The other regulations cited above set forth the requirement that costs be reasonable and adequately documented, and the Administrator also cited these requirements to show that Dr. Thareja's cardiology work did not entitle him to the same salary as a full-time cardiologist. *Id.* at 15-16. Since a full-time physician salary was not a reasonable and documented cost and since CCHP itself offered testimony that Dr. Thareja spent 55% of his time working as a cardiologist, the Administrator acted reasonably—and perhaps generously—in determining that Medicare should compensate Dr. Thareja for his cardiology services at 55% of a top-paid, full-time cardiologist's salary.

### B. The Administrator's Approximation of Dr. Thareja's Reasonable Pay as a Part-Time Cardiologist Does Not Violate the Administrative Procedure Act

Having decided to reimburse CCHP for Dr. Thareja's cardiology services by paying 55% of a top-paid, full-time cardiologist's salary, the Administrator next affirmed CMS's determination of how much pay that was. *Id.* at 17. He noted that CMS "determined the amount it calculated to be the 100th percentile of salaries" based on data from Salary.com and found corroborating support for this figure by looking to actual compensation paid to a cardiologist working for a different healthcare plan in a nearby city. *Id.* at 12. The Administrator determined that CMS was reasonable to use Salary.com data to set Dr. Thareja's compensation because Salary.com reports salaries only when it has statistically significant data that it has tested against "other market indicators such as data from the Bureau of Labor Statistics." *Id.* at 12-13.

CCHP challenges this approximation of a top-paid cardiologist's salary on two grounds. *First*, CCHP argues that the salary estimate depends on unreliable data that the Administrator should have disregarded in favor of data from a survey by the Medical Group Management

7

Association, or MGMA, which it calls the "gold standard" among health care provider salary surveys. Pl.'s Mot. Summary J. 7, 25-27. But whatever other merits the MGMA survey may have, it has the distinct disadvantage that it aggregates salary data across the entire southern United States, while Salary.com provides an estimate of what a cardiologist in the same metropolitan area as Dr. Thareja would make. *Compare* AR 240 *with* AR 250. This makes the MGMA data less useful for determining what compensation would be "commensurate with the compensation paid for similar services performed by similar physicians practicing in the same or a similar locality." 42 C.F.R. § 417.544(a)(1). And even if the relative probity of the two surveys were a close call, the APA does not permit me "to engage in the *de novo* weighing of evidence." *Wis. Valley Improvement v. FERC*, 236 F.3d 738, 380 (D.C. Cir. 2001). Instead, it calls on me to affirm an agency's decision when, as here, substantial record evidence supports it.

*Second*, CCHP argues that the salary estimate depends on calculations that did not accomplish what CMS believed they accomplished, because of a simple misunderstanding of mathematics. Pl.'s Mot. Summary J. 27-29. CMS tried to calculate a 100th percentile salary as 133% of a 75th percentile salary. AR 185-86, 548. CCHP points out that it is impossible to calculate a 100th percentile salary and that, assuming a normal distribution, a salary in the 99.8th percentile would be higher than the value CMS calculated. Pl.'s Mot. Summary J. 28.[4] But the Administrator distanced himself from CMS's misguided calculations, noting that CMS "determined the amount it calculated to be the 100th percentile of salaries" without endorsing the calculation. Compl. Ex. A 12. The Administrator did not determine that CMS correctly

---

[4] According to CCHP's expert, a 99.8th percentile salary calculated from the MGMA survey data for which CCHP advocates, would have been just over $1 million in both 2004 and 2005. AR 552. If Dr. Thareja were entitled to 55% of this compensation, his total pay for both years should have been just over $1.1 million, not the $3.6 million that CCHP still seeks.

8

calculated a 100th percentile salary or that Dr. Thareja deserved 55% of a 100th percentile salary. Instead, he simply determined that it was reasonable to pay Dr. Thareja, as a highly regarded physician, a salary considerably above the 75th percentile for the time that he worked. *See id.* at 17; AR 159. Although the Administrator's estimate of Dr. Thareja's reasonable salary may be a rough approximation, it finds support in the record and does not violate the APA.

## IV.  CONCLUSION

For the reasons above, the Administrator's reimbursement decision does not violate the APA. CCHP depicts the decision as a miserly effort to deny a hard-working doctor his due, but the record shows that the decision provides high compensation to a doctor who inflated his Medicare reimbursement claims by millions of dollars. CCHP's Motion for Summary Judgment will be denied, and the Secretary's Cross-Motion for Summary Judgment will be granted. A separate order will issue.

Dated: July 23, 2018                                             TREVOR N. MCFADDEN, U.S.D.J.